Court is in session. Our third case for the day is International Association of Machinists v. Allen, No. 17-1178. Mr. Walsh. May it please the Court. Ryan Walsh on behalf of the State of Wisconsin. The question in this case is whether a proviso to an exception to a federal criminal bribery statute gives labor unions and right-to-work states a preemptive right to do indirectly what they cannot do directly. What is the purpose of— I want to start right off, if I might. Hello. Hi there. What about all these recent cases from the Sixth Circuit, the Northern District of Georgia, the Northern District of Indiana, the District of Arizona, the Eastern District of Oklahoma, the Eastern District of Michigan, that all seem to think—or not seem to, but all think—that CPAC is still good law regarding preemption in this area? Are they all wrong? They're all wrong. A few of them did not consider the arguments we're making here. One was an arbitration case, for example. About four or five of them are federal district court opinions. Only one is a United States Court of Appeals decision. And in that case, the Sixth Circuit was rather unenthusiastic about the fact that CPAC appeared to be conclusive. There was a two-page argument from the State in that case that CPAC is no longer binding in light of subsequent doctrinal developments. So, yes, to agree with the State's position, you would need to create a shallow circuit split, Your Honor. Shallow circuit splits. Okay. I'm not familiar with that term. One-to-one. Okay. You know, it seems that many of your cases about preemption and the high threshold required don't address preemption under the LMRA or under the NLRA. Isn't the LMRA and labor field somewhat unique in the fact, you know, that these acts were intended to create uniformity in the labor laws? Two points, Your Honor. First, the CPAC district court in 1969 relied on general obstacle preemption and conflict preemption. Those general preemption principles have been channeled into particular interpretations of the preemptive effect of the National Labor Relations Act and the Taft-Artley Act that you mentioned. But the question whether CPAC is still binding focuses on the opinion and the arguments in that case. And with respect to that analysis, we've explained that with respect to implied preemption, for example, the Supreme Court has drastically developed its jurisprudence with respect to that issue. For example, in 1988, in the Puerto Rico case, the Supreme Court said for the first time that implied preemption is not a matter that turns entirely on arguments based on legislative intent. At some point or another, the argument has to tether to the words of the allegedly federally preemptive statute. The court said the same thing in the CSX case five years later. This area of law has changed. Now, I could elaborate on it further, but I want to make sure I get to your second point, which is what about preemption doctrines that have arisen with respect to the Taft-Artley Act? There are three independent reasons why Garmin and machinist preemption are irrelevant to this case. The first is Section 164B applies. An irrevocable checkoff is an agreement requiring membership. And the Supreme Court said in Retail Clerks I that where 164B applies, no other preemption doctrine can apply. Second, even if Garmin and machinist preemption were implicated by this case, those precedents recognize that states retain regulatory power over issues that can be the subject of bargaining. One example is the Sears v. San Diego case. In that case, the state law said you can't trespass here, you can't picket here, but your right to picket remains, the right to picket under federal law. The analogy here is state law has said that checkoffs are permissible, but checkoffs must be revocable within 30 days of written notice, and as long as that notice is communicated to the employer. The right has not been nullified, merely the manner and the time at which that right can be exercised. So we would submit even under those cases now. But does the Wisconsin law not make it impossible for a union to negotiate for a year-long irrevocability period? Is that an impossibility? It is impossible to agree to a checkoff that is not terminable within 30 days of written notice.  It's obviously possible to comply with both laws. All that one has to do is honor terminations of checkoffs within 30 days of written notice, which is less than one year. So literally under the terms of both statutes, there is no impossibility conflict. And my friends on the other side have not suggested that it is impossible to comply with both laws. See, here's a question that's been bothering me. If forced payments to unions are the evil to be rectified here, what should we make of the fact that an employee must make payment to the union for 30 days? Under the Wisconsin law, Wisconsin preserves the administrative convenience that comes with having some time after receiving the notice of revocation to then cancel the automatic dues payment. No statute pursues its goals at all costs. Wisconsin has made a determination that the employer and union are on notice. They have 30 days to rectify the problem of the automatic checkoff. And 164 gives states latitude. They don't have to ban every forced payment of every single penny to a union. They have broad discretion in this area. They can ban or regulate forced payments to unions. At the end of the year, one year, if that 30-day whatever you want to call it, is honored, would they have to renew that the following year? Would another 30-day kick in? Or would that go along from year to year? Would that 30-day be enough and it will hold up as each contract is renewed? I know they talk something about a one-year for the one-year period. The way it would work, Your Honor, is regardless of how the checkoff authorization were written, if an employee sent written notice of revocation, that would have to be honored within 30 days. And for a new checkoff to be authorized, the union employer would have to approach the employee and say, how about this year? Would you sign one this year? And the employee could say yes. And if the employee said yes, the employee would have 30 days once again to give written notice determining. Well, what would happen for that 30-day period? Would they be taking the money or not? They would not because there would be no authorization in effect. Okay. So the denial or the what do you call it, the withdrawal? A withdrawal. Would be in perpetuity until the employee changed, until the employee agreed to something for withholding. That's right. After Act I went into effect, a number of collective bargaining agreements had union security provisions such as an agency shop clause and dues checkoff provisions. What happened was that the union security provisions were nullified because Act I applies to every collective bargaining agreement that's negotiated after Act I. But the checkoffs did not go away. That's what happened to Ms. Applin. She said in July, oh, wonderful, I have this right not to support the labor union. I wish to exercise that right. And the union said, well, we will remove you from our formal list of union members, but we will not terminate the checkoff. Terminate membership but not the checkoff. Well, except membership under the National Labor Relations Act is, as this Court put it in Sweeney, synonymous with paying the union membership dues. And the language of 186C4 is you may enter into certain kinds of checkoffs, or that is certain kinds of checkoffs are not felonies if they forward membership dues to the union. So it's a perfectly coterminous relationship. Now, returning to the question that Your Honor asked about the Labor Management Relations Act, a third point is that from the very beginning of this case, from the complaint on, the sole question, as the district court put it, is not whether Section 157, Section 158, or Section 301 preempt Act 1 in this case. The question is whether 302C4 or 184C4 as it's codified, a federal criminal statute, somehow between the lines not only creates a federal right but creates a preemptive federal right. I would submit that the Supreme Court today applying implied preemption jurisprudence as it exists today could not possibly reach that conclusion. The sole basis for that conclusion by the CPAC district court was one snippet of legislative history. Why should we not send you on your way to tell the Supreme Court they should overrule CPAC? Because the Supreme Court has told lower courts repeatedly, and I know many of these cases are confusing, but they have told lower courts repeatedly that they are to look past summary affirmances in certain circumstances. We have here a well-established machinist doctrine of preemption. We have a summary ruling by the Supreme Court over, in essence, a dissent by Justice Harlan. So the Supreme Court thought about treating that case for plenary treatment of briefing and argument, decided not to affirm summarily, and Congress has not acted on this statutory question in the last 47 years. That seems like a pretty tough row to hoe, at least outside the Supreme Court itself. Well, Congress could well have reasoned that CPAC is no longer in date. For example, in Communication Workers of America v. Beck, the law in this area substantially changed. We're not arguing that only implied preemption changed. We're arguing also that the understanding of 158 and 164 and their use of the term membership has changed. Under current law, as of 1988, merely paying a union pro rata representation fees confers membership on the employee with respect to 158, with respect to 164, as this court held in July. And so that means that states now have power to ensure that employees don't have to choose between union support and losing their job. So with respect, the law has changed. And so statutory stare decisis doesn't have its bite in this context, because it isn't clear that the Federal District Court's opinion in 1969 retains its force. It's not a Federal District Court opinion. I'm glad you made that point. The question is, what did the Supreme Court necessarily decide? Well, it's impossible to determine what they necessarily decided. Did they agree on obstacle preemption? Did they agree on field preemption? Maybe there wasn't a majority of justices on either point. The point is, where that's true, and where especially doctrines have changed in the intervening 46 years in this case, lower courts have an obligation to scrutinize carefully whether the summary affirmance ought to be set aside. If I may reserve the remaining time. I want to go back to a point that you made a bit before. As for field preemption, am I correct that what you're saying is that it's merely a part of a criminal bribery statute here? Is that what you're saying? Yes, as the district court put it, the sole question here is whether the proviso to the exception to the Federal criminal bribery statute field preempts the area of dues checkoff regulations. But you see, the field that we're looking at here is broader than that. Dues checkoff is a matter that's related to wages, hours, and other terms and conditions of employment. And Congress intended to have a single uniform national rule in labor disputes. With respect... So I guess I'd say, you know, I mean, as I sit here with a lot more to think about, you know, yes on field preemption here. With respect, that's not the rule that Congress codified. In 164B, they said agreements requiring membership are up to the states to regulate or ban. This is not a checkoff that goes hand in hand with a valid union security provision. In states that don't have right to work and where unions can and do negotiate for collective bargaining agreements with agency shop provisions, a checkoff or some other automatic system for paying union dues could make some sense. After all, unions, employees in those cases have an obligation to support the union. And to avoid being fired, they might prefer the convenience of money taken from their check automatically without them having to remember to send a check every month. But in states with right to work, with employees who no longer wish to pay the union a single penny, it's clear. It doesn't take a cynic to recognize that an irrevocable checkoff is a union security device. If it were not meant to bolster union security, there would be no reason to make it irrevocable. How many states have right to work law? Twenty-eight states, Your Honor. And how many did they have at the time of CPAC? Sixteen, I believe. That's in the footnotes in Sweeney. I believe it's 16, but it's in Sweeney. Could a union insist that dues be paid a year in advance? It cannot insist that dues be paid in any circumstance in a right to work jurisdiction. I'm not sure I understand. Do I understand the question? Oh, I'm just wondering. It's very important to Wisconsin to have this 30-day cutoff, but I don't understand why a union could not simply say that if dues are going to be paid, they'd be paid a year in advance. Any requirement to pay dues to a labor union is subject to 164B, and as this court held in July, 164B permits Act I. No employee can be forced to pay under any circumstances. Okay. Thank you, Mr. Walsh. Thank you. Mr. Eisenberg? Good morning, Your Honors. My name is Nathan Eisenberg. I represent the Plaintiff Appellees, Machinist District 10 and Lodge 873. May it please the Court. State regulation of the duration of checkoff agreements is very clearly preempted under Section 302C.4 of the Labor Management Relations Act. The Supreme Court's decision in CPAC is binding and controlling on this court, and as we've already discussed, it's been supported by numerous other lower courts, including three other circuit courts and district courts, as well as the National Labor Relations Board. That decision in CPAC — Can we really say that this one sentence saying that employees must be able to revoke their checkoff payment after a year at the latest is part of a framework that is, quote, so pervasive or so dominant that Congress left no room for the state to supplement it? That is absolutely the situation in this case. You're not just looking at Section 302. You're also looking at the fact that checkoff provisions are negotiated as part of collective bargaining agreement between the union and the employer. As such, you would also look — Well, I said that it must be a year at the soonest, if it meant that no state could make the checkoff option revocable sooner. I'm not sure I understand your question. I mean — We might have lost the first few words. Oh, I'm sorry. Let me think. Why wouldn't it have said that it must be a year at the soonest if it meant that, you know, no state could make the checkoff option revocable sooner? Well, I think — and that precise issue is discussed by the U.S. Supreme Court in the Felter case, which talked about the legislative history of the NLRA and that provision in particular and making choices on when the revocations could occur. And so getting back to the point is that because dues checkoff or checkoff is something that is negotiated, you look not at Section 302 in isolation, but you integrate that as part of the rest of the NLRA, including Section 883, and also the provisions that talk about unfair labor practices under the NLRA. So the U.S. Supreme Court has decided, even leaving CPAC to one side, the U.S. Supreme Court has decided on multiple occasions for state regulation of collective bargaining agreement to avoid federal preemption, it must fall within the scope of 14b. And since negotiation of checkoff is a mandatory subject of collective bargaining agreement and has never, ever been considered a union security device, state regulation in that area is preempted by federal law. But as a practical matter, as a practical matter, how is the checkoff different from a union security device? Both require payment to the union for a period of time, right? They both include money, but the consequence of those two agreements is different. A union security device requires membership upon pain of discharge. That's what union security is, that if you're not a member, you can be fired. A checkoff authorization does not do that. A checkoff authorization in all situations is voluntary and it's revocable, and employees cannot be fired for failing to sign a checkoff authorization, nor can they be fired for revoking one. I'm sorry. Oh, I'm sorry. See, there's a little lag. I'm so sorry. What does it mean to say that someone has revoked her membership if she continues to pay dues? Well, and if you look at the language on the card itself, it specifically explains this, and this is something that the NLRB has discussed in cases like National Oil Well, that it is possible for members of the bargaining unit to continue to provide financial support to the union separate from union dues. And on the authorization card that originally triggered this, it makes that very, very clear. On that it says that the financial support that is being given to the union is not a quid pro quo for union membership. So there is a distinction, again, between union security and dues checkoff, and that is something that has been recognized by both the U.S. Supreme Court in cases like Felter, in lower courts, in cases like Shenmar and the Atlanta publishing case. So that is something that is longstanding. You said that the Supreme Court has equated the act of paying a union for representation with the status of membership? Is that what you're saying? No, that's not what I said. The Supreme Court in Felter specifically said that a union security device and a dues checkoff agreement are two separate and distinct agreements, so that checkoff is not synonymous with union security and therefore does not fall within the scope of 14B. And again, if you look at the structure of the NLRA, these things are apparent. Section 8A.3 of the NLRA specifically allows negotiation of union security provisions in collective bargaining agreements. And there's an inherent tension between 8A.3 and Section 14B, which is the provision that allows states to vary that through so-called right-to-work laws. So the Supreme Court in the oil and chemical workers case from 1976 talked about that fact, about that inherent tension between 8A.3 and 14B, and specifically said that unless the state regulation is going to fall within the restrictions of 14B, that that law is going to be preempted. And it's going to be preempted because that's a subject for a collective bargaining agreement. Now, the state here has given short shrift to the San Diego Building Trades versus Garmin. Garmin, and I guess you could refer to it as Garmin preemption, talks about issues that are subject to collective bargaining agreements and that are subject to unfair labor practices, are in the exclusive jurisdiction of the National Labor Relations Board, and regulation of those things is preempted. And so under Garmin preemption, it's very clear that the state cannot create new unfair labor practices other than those that are directly related to union security. And the National Labor Relations Board has uniformly in a wide range of cases, including a recent case involving the same union and the same law, have found that negotiation of checkoff is a mandatory subject to bargaining and that state regulation in this area is preempted. But if it's a declaratory action against the state, then NLRB isn't involved anyway, is it? It's not involved in this case. The issue is the preemption of the state law. But my point here is you can't take that Section 302 and read it out of, or read it in isolation out of where these checkoff agreements are arising from, which is from collective bargaining. Well, there's another sort of, what do you want to call the words, that they called doctrinal changes, things that have happened. This is mentioned earlier that there are 28 states that have a right to work laws. That is a substantial number that you may call it conflict or that there's tension, and I think that's pretty accurate. And this is one of those things where CPAC is, well, I don't want to focus on it and diminish it further than it is, but I think it diminishes itself quite a bit. I think it's a very narrow case, and when you have a summary that just goes on up with a few sentences and that's it, there's a whole lot of things that have been going on in the meantime. And I think even, well, I won't go into this about what recently happened about this very issue, but there's still some discussion about how those things may be rendered challengeable if not obsolete. I respectfully disagree with that. There's been no case ever that has said that CPAC was wrongly decided. I know that, but there's still there. Not yet, at least. I'm not going to beg that question. But there has been no case that talks about that the underlying notions that underlie CPAC have changed in any way. The preemption doctrines involving the NLRA and the LMRA have not changed. There have been no changes to that. So the recent cases that the state is attempting to rely on are challenges to right-to-work laws. They are not challenges to checkoff. Those are two separate and distinct concepts. So when the state is relying on recent challenges such as Sweeney and the challenges to Wisconsin's right-to-work law that are still sort of working their way through the system, those deal with union security. They do not deal in any way with checkoff. And so the decision from the Sixth Circuit last year involving this issue in Hardin County, Kentucky, specifically said that CPAC is still good law and swatted away any claim that there had been doctrinal developments in this area. There have been no cases that are cited anywhere in the record or that we can find that have questioned in any way checkoff. They all involve union security. But, again, all they're doing is going back to CPAC and saying that's what it is, even though there hasn't been any developed law beyond that. As you point out, this is what's happening. So all I'm saying is it seems that there are a lot of things going on around the country, really, that are going to raise these challenges that we have here. My point is even if you set CPAC to one side, you still have to contend with other Supreme Court cases such as Garmin, such as the oil and chemical workers. I think that's correct. There are other cases that talk about that unless it's a union security legislation, that it's going to be preempted by the broad field preemption that's applied under the NLRA. Okay. And I think looking at those other cases, it's probably a valid analysis. Right. Beyond CPAC. Right. Because, and I want to make the point, is that the preemption doctrines under the NLRA and the LMRA are different than other types of preemption cases. Federal labor law has a very broad field preemption, and it's always had very, very broad field preemption. Well, that's what they prefer, preemption and that's it. Next question. Yes. And that's covered in a wide range of cases and has been recognized repeatedly by the U.S. Supreme Court, talking about field preemption in this area. So when you're talking about, again, negotiation of these checkoff agreements, those are things that are subject to bargaining. Things that are subject to bargaining are within the exclusive jurisdiction of the National Labor Relations Board. State regulation in this area is preempted. And, really, the state has raised no substantive argument that CPAC is wrongly decided without making or without trying to use union security and checkoff interchangeably. And the law is very clear that those concepts are not interchangeable and have never been interchangeable since the very beginning of the act. Thank you very much. Thank you, Mr. Eisenberg. How much time left? One minute for rebuttal, if you'd like. Mr. Walsh. Thank you, Your Honor. Very briefly, this discussion of what is a union security device has been in the clouds. I'd like to bring it down to the real world. 164B says an agreement requiring membership is what states have power to regulate. At the time the Taft-Hartley Act was passed, commentators and many legislators widely regarded irrevocable checkoffs as a form of union security agreement. That's literally the language in the House report. What about a maintenance of membership provision? Everyone agrees that's a union security device within 164B. A maintenance of membership provision says that once you join the union, you don't have to join the union, but once you join the union, you are required, over the life of the collective bargaining agreement, to pay it dues. The Supreme Court held that a maintenance of membership provision, the case is Algoma, is within 164B. There is no material difference between a maintenance of membership provision and an irrevocable checkoff. Thank you, Your Honor. Thank you, Mr. Walsh. Thanks to counsel for both sides. The case is taken under advisement.